fore, is not touched by the provisions of the act. This argument is ingenious but not satisfactory. Call it by what name you will, the administrator does in *fact pay* himself, he receives the money of the intestate, and applies it to the payment of his own debt. There is nothing in the act which looks like a distinction between the administrator and any other creditor, and where equality of payment is the object, I am inclined to give a liberal construction. There is no reason why the administrator should be favoured in payment of his debt, as the law allows him an adequate compensation for his services in administering the estate.

Another point is made on this appeal, which does not admit of so easy a solution. The act of assembly gives a preference to *servants' wages*. The intestate Mr. *Ashman* was concerned in iron works, and the persons employed in these works claim a preference as *servants*. The term *servants*, in its largest extent, is very comprehensive. It includes not only all those employed by another to do any kind of work or labour, but even agents in mercantile and other branches of business, in which bodily labour is not exerted. It has not been contended that the act of assembly is to be construed in the utmost extent. We must therefore seek for some more limited and reasonable sense. I know none so proper as the common understanding of the country, which seems to confine servants to that class of persons who make part of a man's family, whose employment is about the house or its appurtenances, such as the stable, &c., or who, residing in the house, are at the command of the master, to be employed at his pleasure, either in the house or elsewhere. We find that in ancient *English* statutes, a distinction is made between *servants, labourers and workmen*, although in a large sense they are all servants. The statute 23 *Edw.* 3. *ch.* 2, is in Latin, of which the following is a literal translation: " and if a reaper, mower, or any other *work-* " *man* or *servant* of whatsoever state or condition he shall " be, retained in the service of another, shall depart from " his said service before the end of the term agreed on, " without reasonable cause or license, let him undergo the " pain of imprisonment." The statute of 5 *Eliz. ch.* 4, speaks of " servants, workmen, artificers, apprentices and labourers." And the statute 1 *Jac. ch.* 6, declares that the sta-

tute 5 *Eliz.* shall extend to the rating of wages of all " la-
" bourers, weavers, spinsters, and workmen or workwomen,
" either working by the day, week, month or year, or taking
" any work by the *great* or otherwise." I am induced to
think that the word *servants* in the act of assembly on
which this case arises, was intended to be used in the limi-
ted sense I have mentioned, from a comparison of it with
the act of 1705, which must have been directly within the
view of the legislature, when the act of 1794 was made,
because they not only repealed it, but introduced conside-
rable alterations. The act of 1705 comprehended ten classes
of creditors, according to which the priority of payment
was regulated. *Servants* were placed so low as the *ninth*
class, and were coupled with workmen; *servants' and work-
mens' wages* are the expressions. The act of 1794 has but
six classes, of which *servants*, together with *physic* and *fu-
neral expenses*, make the *first;* but there is no mention of
*workmen.* It cannot be supposed that *workmen* were omitted
by accident. On the contrary, it is more reasonable to con-
clude, that *servants* being raised to the *first* grade, it was
intended to confine them to those who in common parlance
are so called. It is not to be forgotten, that although this
act gives some preferences in payment, yet there is an evi-
dent intent pervading it, to lessen the number of these pre-
ferences, and to introduce equality as far as justice and con-
venience would permit. There is a great variety of persons
employed in iron works, managers, colliers, wood-cutters,
waggoners and those whose business is out of doors, beside
a numerous tribe engaged in melting, casting, and forging
within. Of those persons the wages are different. Some are
paid by the year, month, or week, and some by the job or
piece, but all are unconnected with the domestic scene; all
may be properly called workmen, and none are commonly
called servants. I am therefore of opinion, that the Orphan's
Court were right in denying them a preference, and that the
decree should be affirmed.

YEATES J. I entirely assent to the opinion delivered by
Mr. President *Roberts* in the Orphan's Court of *Fayette*
county.

The policy of the act of the 19th of *April* 1794, in sec. 14,

was to place all creditors, whose debts were of equal dignity at the time of the death of the deceased, upon one common footing. This court have so decided in several instances. The legislature have declared the classes of debt which are entitled to a preference, but are wholly silent as to any special claim of priority by executors or administrators over other creditors of equal degree. It has been urged in the course of the argument, that on the immediate death of the party, the demand of the personal representatives is extinguished by assets coming to their hands, provided creditors of superior dignity are not injured thereby. But however plausible this argument may seem in the case of executors, it is by no means applicable to administrators. The former derive their authority under the will of the testator, and are complete executors before probate for every purpose, except filing a declaration, on account of the profert of letters testamentary therein contained. But the powers of the latter arise from the time of granting administration to them. 1 *Salk.* 301., *Comy.* 151. Indeed the usual mode in suits brought against executors, in case of an apprehended deficiency of assets, where they have demands against their testator, is to plead a retainer of their own debt, though it must be admitted, they may either plead it or give it in evidence. 3 *Burr.* 1383., 5 *Co.* 60. No privilege is granted to an executor or administrator different from what they might confer on other creditors, or which such creditors themselves might procure by due vigilance. It is plain to me, that the claim of one of the administrators in the present instance to be allowed the whole of his simple contract debt, is in direct opposition to the law, and unfounded in any principle of justice or equity.

The great difficulty of this case, is to affix a correct and precise meaning to the words *servants' wages* in this law. Upon all hands it is agreed, that they cannot be confined to slaves, or indented servants, who are not entitled to wages; and that they cannot be extended to the relation of master and servant in the general legal sense of those terms, where one acts under the direction or command of another, because no reasonable ground of preference can be assigned to the character of servants in such large and comprehensive acceptation.

The ancient common law was highly favourable to the

demands of servants in the order of administration, inasmuch as it said they were to be paid among the first debts. *Bracton, lib.* 2. *c.* 26., *Fleta, lib.* 2. *c.* 57. *s.* 10. By those authors they are called *servitia servientium et stipendia famulorum.* An action of debt might be brought by a servant for his wages, against the executors or administrators of a deceased person, because in such cases the deceased could not have waged his law as he might in matters of simple contract in general. *Swinb.* 458, (6*th ed.*) *Godolph.* 221. Debts for the wages of a servant within the statutes of labourers, shall be paid before simple contracts. 1 *Roll. Abr.* 927. *l.* 35. But a quere is put in the same page, *l.* 45, whether a debt by simple contract should be paid after a debt for wages by a servant who is not within those statutes. A distinction has been taken between one retained by a testator to paint for a year, and a common labourer, who may be driven to work against his will, his salary being put in certain by the statute. *Bro. Executor* 87. cites 4 *H.* 6. 19. And the same distinction is taken between the salary of a labourer or servant, and of a priest. *Bro. Executor* 163, cites 11 *H.* 6. 48. In *Went. Office of Executors,* edited by *Curson, c.* 11. *pa.* 121, it is thus expressed. " When the testator retaineth servants in husbandry or otherwise, and dieth, there being wages due to these so retained, the executor is liable to an action of debt for the same, by reason that the parties were compellable by statute thus to serve, and therefore the testator could not have waged his law. But in case of servants not compellable, as *waiters* or *serving men* as we call them, no action of debt lieth against the executor for their wages, though against the testator himself it doth, for the contract is sufficient to charge him who made it."

It is worthy of observation, that under the old act of 1705, " directing the order of payment of debts of persons deceased," *servants' and workmen's wages* were placed on an equal footing, and put in the ninth grade, being preferred to debts arising " on merchant's and tradesmen's books, and " promises by word, arrears of account and such like." But in the act under consideration, *physic, funeral expenses and servants' wages,* rank together in the first grade, and the term *workmen* is wholly omitted. We are bound therefore to conclude, that the intention of the legislature was, that there-

after workmen's demands should not rank in the same degree of dignity as those of servants; and are naturally led to inquire into the grounds of legislative preference of the first creditors.

Decency, as well as regard to the public health, point out the necessity of consigning the dead body to its original earth. Medical aid is obtained with more facility when there is a reasonable prospect of remuneration for services, whatever may be the event of the disorder. The same observation is applicable to servants, who are indispensable in most families; their attention and attachment to their master in all the vicissitudes of life well deserve to be rewarded. Besides, it strikes me forcibly, that the inferior humble sphere in which they move, and their dependence on their masters, intitle them to legal protection. These are probably some of the reasons which influenced the legislature in the formation of the first class of creditors.

I am then satisfied on the fullest reflection that the word *servant*, used in the 14th section of the act of the 19th of *April* 1794, must be restricted to its common and usual sense, as understood by householders. It signifies a hireling, one employed for money to assist in the economy of a family, or in some other matters connected therewith. I count it of no moment that the party hired does not sleep or eat within the walls of the house. I denominate a gardener, coachman, footman, &c., who live out of the family, as servants within the true meaning of the act. Not so of a clerk or bookkeeper, who, however meritorious his services might be, would scorn to be placed in the rank of servitude. Nor can I conceive the smallest propriety in calling those persons who were employed by *James Ashman* in his life time in the manufacture of iron and business incident thereto, *servants*, and therefore intitled to a preference as such. They would justly be styled *workmen*, under the operation of the act of 1705.

On both grounds therefore, I am of opinion, that the Orphan's Court acted correctly in setting aside the report of the auditors, and that their decree be affirmed.

Brackenridge J. "Among these simple contracts," says *Blackstone*, 2 *Com.* 54, " servants' wages are by some, with

reason, preferred to any other; and so stood the ancient law, according to *Bracton*, and *Fleta*, who reckon, among the first debts to be paid, *servitia servientium et stipendia famulorum.*" Are *servientes* and *famuli* the same description of persons, or different classes of those that serve? The terms in the *Latin* language which is used, import different classes or conditions. The *familia* amongst the *Romans*, was the body of household servants. They were called *familiares*, and *famuli* or *famulæ*, men or maid servants. The *servi*, who were by far the most considerable, were those employed in husbandry and manufactures. See *Adams' Antiq.* 35, and the authorities there cited. Though slavery was not known to the common law, yet the different kinds of servants would seem to be referred to, under the *servientes* and the *famuli*. It would be tautological, if there was not a distinction.

When we come to the statute law, we find the term *servants* used in a more extensive sense than that of *domestic servants.* 23 *Edw.* 3. " If a workman or servant depart from service before the time agreed upon, he shall be imprisoned." This is the title of the chapter. In the chapter itself it is " *si messor, falcator, aut alius operarius*, aut serviens *cujuscunque status vel conditionis fuerit, in servitio alicujus retentus.*"

Passing over a number of other statutes in which the term *servant* would seem to be used in a *more extensive sense* than that of *domestic servant*, we come to that of 5 *Eliz. c.* 4, which refers to preceding statutes, and purports to substitute more effectual provisions for both master and servant. It is entitled " an act containing divers orders for artificers, labourers, servants of husbandry and apprentices." The preamble is, " that although there remain and stand in force presently a great number of acts and statutes concerning the retaining, departing, wages and orders of apprentices, as well in husbandry as in divers other arts, mysteries and occupations, yet partly for the imperfection and contrariety that is found and doth appear in sundry of the said laws, and for the variety and number of them, and chiefly for that the wages limited and rated in many of the said statutes are, in divers places, too small and not answerable to this time, respecting the advancement of prices of all things belonging to the said servants and labourers, the said laws

cannot conveniently, without the great grief and burthen of the poor *labourer and hired man*, be put in good and due execution, therefore, &c. that, as much of all the statutes heretofore made, and every branch of them, as touch or concern the hiring, keeping, departing, working, wages or order of servants, workmen, artificers, apprentices and labourers, are repealed." By the third, fourth, fifth and sixth sections the new provisions are made, and, the services which they shall respect, enumerated. Amongst these we find husbandry, digging, seeking, finding, getting, melting, filing, working, trying, making of any silver, tin, lead, *iron*, &c. *The workmen, in the case before us, were retained in the manufacture of iron.*

The statute of *Elizabeth* has not been introduced in *Pennsylvania;* and I refer to it only as shewing the *extent* in which the term *servant* was used, and that it is not confined to *domestic* service; and as showing also, that workmen, labourers, artificers, &c. are used as expressing kinds of service, and not as distinguished from servants: so that I can draw nothing from the use of the terms " *servants and workmen*" in a former act of assembly, and the omission of the term workmen, in the act of 1794. If any thing, I would infer, that the term *workmen* was omitted as being synonimous; or, lest the enumerating one species of service might seem to exclude any other species; for *expressio unius exclusio est alterius*, and *it is dangerous in a general law to attempt to enumerate and descend to particulars.* It is safest to give the *genus*, as the legislature of 1794 may have thought adviseable, and in using the term *servants only*, to have left it to the courts to say who should be considered servants, so as to be entitled to a priority in the payment of wages; and which must depend on the common law extent of the term servants. In this particular there could be no change of the common law of *Pennsylvania* from that of *England*, unless by act of assembly. If any principle whatever could remain unaffected by the change of *situation*, it must be the relation of master and servant, and the correspondent rights. These are detailed, 1 *Blac.* 428. *First*, " The master may maintain, " that is abet and assist his servant in any action at law " against a stranger. *Second*, A master may bring an action " against any man for beating or maiming his servant. A " master may likewise justify an assault in defence of his

"servant, and a servant in defence of his master also. *Third*, "If any person do hire or retain my servant being in my "service, for which the servant departeth from me and goes "to serve the other, I may have an action of damages both "against the new master and the other, or either of them." The reason and foundation upon which all this doctrine is built, says the commentator, seems to be the property that every man has in the service of his *domestics*, acquired by the contract of hiring, and purchased by giving them wages.

Here would seem to be an inconsistency and oversight of the commentator in the introduction of the word *domestics*, as if this were the only class of servants to which the reason extended. In stating the different "sorts of servants acknow- "ledged by the law of *England*," these are mentioned as the *first*, "so called from being *intra mœnia* or domestics;" but this is not the only class. He goes on to enumerate others; *second*, apprentices; *third*, labourers who are only hired by the day or by the week, and do not live *intra mœnia* as part of the family. Will it be said that an action in *Pennsylvania* will not lie for enticing away a labourer at husbandry hired by the day, week, month or year? Much less that it will not for enticing away hands employed at a manufactory? *This I take it will be the proper criterion, and best test of the meaning of the term servant.*

Then with regard to the policy; for I will admit that the *reason and policy of a construction* in the extent to be given to the term, ought to weigh in ascertaining what was the extent intended by the legislature. And in this view of the question, it would seem to me that in the case of domestic servants there is the least reason for a preference in the payment of wages; because it is seldom, if ever, that arrears of wages are due. *Domestics* are usually paid by the week or month, and a household establishment of servants seldom consists of more than one or two; the bulk of the people being obliged to be their own servants, and as to work within doors oftentimes without any at all. The wages of *domestics* therefore, or what are called menial servants, would seem to be too small an object to require the interposition of a statute. The inducing such to continue in service during *a last illness*, though a consideration of humanity, yet does not appear to me to be an object of such extensive policy, as the

security which a man may have in his dependence upon servants in *agricultural improvements, or the establishment and carrying on of manufactures.*

The lien which tradesmen may have on the materials furnished to customers, may distinguish them in reason from persons hired at wages for the time, or by the job, as the phrase is.

On what ground shall we *restrain* the common law meaning of the term *servants*, and in this act of assembly confine it to domestics, or those employed in the drudgery of the household, or waiting on the person? Will not popular acceptation and common parlance restrain it still more? For we do not call even apprentices servants. Speaking *of* hired persons, we may call them servants; but not speaking *to* them, but at the risque of losing their service. I know of no description of persons, those bound by indenture to *serve* excepted, who would be willing to be called servants, unless members of assembly in *a political meaning.* The popular application of the term therefore would be too uncertain, where the rights of persons, whatever may be the names of things, are interested. It is remarkable that in the act of assembly of 1794, the grade in the order of payment of servants' wages, is changed from what it was at common law; and a rank is given higher in the order of paying debts, and also higher than in the act of 1709. Is it the inference that from this advancement of the grade, the extent which had been given to the denomination of servants is to be *contracted?* If it had been the intention of the legislature to contract, it would seem to me, that the term *domestic servants* would have been used. But the term *servants* having been more extensive at common law, and under the statutes, and, as I take it, the *construction* having been more extensive under the act of assembly of 1709, are we at liberty to confine the term to a more contracted application? It is remarkable that by the act of 1709 the *commonwealth* has a preference after funeral expenses and physic, and takes the place of the *prerogative of the king* at common law. In the act of 1794, the *commonwealth* has the last place. But it will not be inferred that any thing more than the *grade* was changed, and not the *nature of the debts.*

1812.

Ex parte
MEASON.

I just note an authority from *Rolle's Abridg.* 1 *Roll.* 927, *viz.* " that debts for servants' wages within the statute of " *labourers*, shall be paid before simple contract debts." This puts *labourers* within these statutes, upon the footing of other servants; and it has been already seen what labourers within these statutes are specified as servants. These are not only in-door but out-of-door servants of husbandry, *manufactures* &c. I must therefore think that in the case before us, which is that of *hired persons in the manufacture of iron*, the construction of the court below is too narrow, in restraining the priority to *menial or domestic servants*. Under the other head, the *retainer*, I incline to affirm their judgment, and on this to reverse.

Decree affirmed.